UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SUSAN LEA GREEN,               )
                              )
              Plaintiff,       )
                              )
      v.                       )        No. 4:10CV209TIA
                              )
MICHAEL ASTRUE, Commissioner   )
of Social Security,            )
                              )
              Defendant.       )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

Claimant Susan Lea Green filed Applications for Disability Insurance Benefits under Title

II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 108-28)[1] and Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 104-

07). Claimant states that her disability began on May 31, 2007, as a result of back problems,

arthritis, mitral valve prolapse, shoulder, hypercholesterolemia, angina, bronchitis, hernia,

insomnia, and heel spur on both heels. (Tr. 43, 153). On initial consideration, the Social Security

Administration denied Claimant's claims for benefits. (Tr. 43-47). Claimant requested a hearing

before an Administrative Law Judge ("ALJ"). (Tr. 51-52). On December 9, 2008, a hearing was

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 14/filed May 6, 2010).

held before an ALJ.  (Tr. 20-39).  Claimant testified and was represented by counsel.  (Id.).

Thereafter, on July 31, 2009, the ALJ issued a decision denying Claimant's claims for benefits.

(Tr. 8-19).  On December 4, 2009, after considering the additional medical records of Dr.

Alexander Beyzer, the Appeals Council found no basis for changing the ALJ's decision and

denied Claimant's request for review of the ALJ's decision.  (Tr. 1-5, 541-48).  The ALJ's

determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.   Evidence Before the ALJ

### A.  Hearing on December 9, 2008

#### 1.  Claimant's Testimony

At the hearing on December 9, 2008, Claimant testified in response to questions posed by

the ALJ and counsel.  (Tr. 20-39).  Claimant lives with her seventy-five year old father in his

home, and he supports her.  (Tr. 26-27).  Claimant completed three years of college.  (Tr. 27).

Claimant testified that she is a registered nurse.  (Tr. 27).  Claimant reported her height to be five

feet tall and her weight to be one hundred eighty pounds.  (Tr. 28).

Claimant testified that she cannot work, because she cannot stand on her feet longer than

fifteen to twenty minutes at a time before experiencing severe pain and swelling in her feet.  (Tr.

25).  When sitting down, Claimant has to elevate her feet to reduce the pain and swelling.  (Tr.

25).  Staying off her feet helps with Claimant's pain in her feet.  (Tr. 31).  Claimant testified that

she has torn rotator cuffs in both shoulders and lower back pain.  (Tr. 25).  Claimant testified that

she has fibromyalgia and congestive heart failure.  (Tr. 26).

Claimant testified that she last worked for Dr. Chand in July/August 2007.  (Tr. 26).

Claimant's work limitations as ordered by Dr. Chand included reducing her work week from forty

hours to three days a week. (Tr. 26). Claimant testified that the heaviest item she would have to lift in her job was a fifty-pound child. (Tr. 28).

Claimant testified that she can walk about one hundred feet without stopping. (Tr. 34). Claimant can sit or stand for five to ten minutes before she experiences pain. (Tr. 34). Claimant testified that she could work two hours our of an eight-hour workday, and she would have to be able to shift her position at will and take unscheduled breaks. (Tr. 34-35). Claimant testified that she can carry five pounds, but she has problems with her hands because of her osteoarthritis. (Tr. 35). Claimant opined that she would have to miss two days of work each week. (Tr. 35). Claimant testified that the severity of her pain interferes with her concentration. (Tr. 36).

Claimant testified that Dr. Christopher Sloan performed foot surgery on her left heel. (Tr. 24). After the surgery, her pain continued and then Dr. Chand diagnosed Claimant with diabetic neuropathy in her feet and legs in July 2008. Claimant testified that Dr. Chand placed specific limitations regarding her ability to work. (Tr. 24). Claimant testified that her normal blood pressure reading is 177/112 and sometimes medication helps regulate her blood pressure. (Tr. 28). Claimant takes medication for her shoulder pain, muscle spasms, hypertension, diabetes, and thyroid. (Tr. 29). Claimant testified that Dr. Chand told her she should not work. (Tr. 29). Claimant's attorney stated that he did not see in the record Dr. Chand's finding Claimant cannot work. (Tr. 25). Claimant testified that Dr. Chand has been treating her for three years, and she sees him on a regular basis. (Tr. 37). Claimant's diabetic neuropathy and bone spurs cause her to experience pain all the time. (Tr. 30). Claimant testified that she also has pain in her shoulders, and she receives steroid shots to alleviate the pain. (Tr. 30-31). Claimant also experiences numbness in her legs. (Tr. 30). Claimant has problems sleeping and maintaining concentration.

(Tr. 30). Claimant rated her foot pain at a level eight/nine. (Tr. 31).

Although Claimant has not been treated by a psychiatrist, she testified that Dr. Chand requested that she be treated by a psychologist for her depression and problems with concentration. (Tr. 36).

As to her daily activities, Claimant testified that she wakes up in the morning around 7:00. (Tr. 32). Claimant turns on the coffee pot and then sits on the couch with her feet elevated. Claimant spends the day reading and watching television. Claimant cannot sit through an entire church service. (Tr. 32). Claimant testified that she can drive short distances to the grocery store. (Tr. 33). Claimant testified that she loads the laundry, and her father folds and puts away the laundry. (Tr. 34).

At the end of the hearing, the ALJ noted that the record contained only two pages of treatment notes for 2007 and no treatment records for 2008. (Tr. 37). Counsel indicated that he had faxed the medical records to the ALJ. (Tr. 37).

## 2. Denial of Medical Assistance Application

On April 25, 2008, the Missouri Department of Social Services found that Claimant has met the burden for establishing that she is medically eligible to receive Medical Assistance benefits. (Tr. 77-81). In relevant part, the Director found that the [e]vidence presented at the administrative hearing established Claimant is permanently and totally disabled as defined by the Family Support Division. Claimant's symptoms prevent her from performing duties associated with substantial and gainful employment." (Tr. 80).

## 3. Forms Completed by Claimant

In the Missouri Supplemental Questionnaire completed on November 22, 2007, Claimant

reported living alone and noted "Father, 74 years old, is suppose to move in with me and help me but he is very ill with diabetes and heart trouble. Will send note when or if he moves in." (Tr. 144-51). Claimant indicated that she does the laundry and dishes, makes the bed and changes the sheets, vacuums and sweeps, takes out the trash, and goes to the post office. (Tr. 147).

In the Disability Reports Adult, Claimant reported that she stopped working on November 13, 2007. (Tr. 153). Claimant indicated that she continued to work part time with lighter duty. (Tr. 153).

## III. Medical Records

On January 30, 2006, Dr. Christopher Sloan evaluated Claimant's pain and tenderness in her left heel. (Tr. 363). Claimant reported having been treated with injections, over-the-counter arch supports, nonsteroidal antiinflammatory injections, and stretching exercises. Dr. Sloan recommended a instep plantar fasciectomy. (Tr. 363). On February 17, 2006, Dr. Sloan performed an instep plantar fasciectomy on Claimant's left foot. (Tr. 364-68). On March 3, 2006, Claimant returned status postoperative two weeks and reported doing quite well but having some calf and leg pain. (Tr. 372). In a follow-up visit on March 27, 2006, Claimant reported being stable and her pain improving. (Tr. 371). Dr. Sloan prescribed Vicodin for end-of-the-day pain. (Tr. 371).

Claimant reported tenderness in her right foot, and Dr. Sloan administered an injection. (Tr. 370). In a follow-up visit on May 17, 2006, Claimant returned to Dr. Sloan's office for treatment of her pain and tenderness in her right heel. (Tr. 369). Claimant reported an injection helped with her pain and tenderness in her right calf and leg. Dr. Sloan injected Claimant's right

heel. (Tr. 369).

On September 8, 2006, Dr. Chand treated Claimant for the pain in her left shoulder and hypertension. (Tr. 217). Dr. Chand diagnosed Claimant with uncontrolled hypertension, mitral valve prolapse, lower back pain, and rotator cuff injury. (Tr. 219). Dr. Chand prescribed medications as treatment. (Tr. 219). In the follow-up visit on September 22, 2006, Claimant reported having severe bronchitis. (Tr. 214). Dr. Chand found Claimant to have acute bronchitis, otitis media, pharyngitis, and obesity. (Tr. 215). Dr. Chand prescribed medications as treatment. (Tr. 216).

Claimant reported pain in her left shoulder to Dr. Chand on October 6, 2006. (Tr. 211, 471). Dr. Chand included in his assessment shoulder pain, hypothyroidism, and obesity and prescribed medications including Vicodin as treatment. (Tr. 212-13, 472-73).

On November 2, 2006, Claimant returned to Dr. Chand's office with her chief complaint being obesity. (Tr. 226). Claimant reported exercising by walking a mile seven days a week. (Tr. 226). Claimant smokes one package of cigarettes a day. (Tr. 226). Claimant reported pain with rotator cuff tear on November 10, 2006. (Tr. 223). In the assessment, Dr. Chand listed rotator cuff tear and herniated nucleus pulposus lumbar (slipped disc in lower back). (Tr. 225). Dr. Chand prescribed Vicodin as treatment. (Tr. 225). In the follow-up visit on December 27, 2006, Claimant reported weight gain since stopping thyroid medication. (Tr. 220). Dr. Chand listed hypothyroidism, obesity, anxiety syndrome, and depression in the assessment. (Tr. 221). Dr. Chand prescribed a medication for treatment of the thyroid gland. (Tr. 222).

In the return visit on January 4, 2007, Claimant reported fatigue. (Tr. 208). Dr. Chand found Claimant to have fatigue, insomnia, hypertension, obesity, and heel pain and prescribed

medications as treatment.  (Tr. 209-10).

On March 6, 2007, Claimant reported having an upper respiratory infection for five days. (Tr. 205).  Dr. Chand diagnosed Claimant with bilateral otitis media (middle ear infection) and prescribed amocacillin, Claritin, and Robutussin with codeine as treatment.  (Tr. 206-07).

In the work release form completed after Claimant received treatment for her lower back pain in the emergency room at Parkland Health Center on April 22, 2007, Dr. Brett Dickinson found in the work release form Claimant could return to work on April 24, 2007, with no heavy lifting over twenty pounds and no prolonged standing.  (Tr. 396-401).

In an office visit on May 4, 2007, Claimant reported continuous pain in her left shoulder. (Tr. 202).  Examination revealed no restriction to passive range of motion and decreased strength with resistance when compared other arm, and Neer's test for rotator impingement is noted.  (Tr. 204).  Dr. Chand diagnosed Claimant with rotator cuff tendinitis and partial tear, shoulder pain, and uncontrolled hypertension and prescribed Histex, Synthroid and Atarax as treatment.  Dr. Chand also limited Claimant's ability to lift weights to no more than twenty-five pounds from May 4 through May 30, 2007.  (Tr. 204).  Claimant returned on May 9, 2007, complaining of left shoulder pain being work related.  (Tr. 199).  Examination revealed decreased strength with resistance when compared to the other arm, and Neer's test for rotator impingement is noted. (Tr. 201).  Dr. Chand prescribed physical therapy three times a week and added Iovastatin to her medication regime.  (Tr. 197-98, 201, 384).

Claimant started physical therapy on May 22, 2007, at Parkland Health Center and returned on May 26, 2006.  (Tr. 382-84).  Claimant cancelled her therapy sessions on June 5 and 11, 2007, due to illness.  (Tr. 375, 381-82).  Claimant returned for treatment on June 13, 2007.

(Tr. 375, 382). On June 15, 2007, Claimant cancelled her appointment noting that she is sore all over her body. (Tr. 375). Claimant missed her scheduled physical therapy appointment on June 20, 2007. (Tr. 381). On June 22 and 25, 2007, Claimant cancelled her appointments for personal reasons, and failed to keep her scheduled appointment on June 27, 2007. Claimant returned for physical therapy on June 29, 2007. (Tr. 381). On July 16, 18, and 25, 2007, the physical therapist called Claimant regarding therapy but received no answer. (Tr. 380). On August 6, 2007, the physical therapist called Claimant but received no answer. On August 17, 2007, the physical therapist discharged Claimant due to lack of compliance in calling to reschedule appointments noting Claimant's last kept appointment to be on June 29, 2007. (Tr. 380).

On June 8, 2007, Claimant returned for a review of left shoulder rotator cuff strain/tear requesting a statement of care showing the duration of time she has been treated inasmuch as the workmen's compensation system finding her problem is not work related. (Tr. 196). Claimant requested Dr. Chand write a narrative to document the process of caring for the left shoulder injury and the injury's relationship to work. (Tr. 196).

On June 29, 2007, Claimant returned to Dr. Chand's office for treatment of her pain in both arms. (Tr. 193). Examination revealed nontender to muscular tissue palpation but deep palpation between radius and ulna tender with pressure through skeletal compression negative for elicitation of pain. (Tr. 194). Dr. Chand diagnosed Claimant with atypical muscle pain in both arms, family history of diabetes, and hyperglycemia and ordered a lupus panel be completed and Claimant to return in one week. (Tr. 194-95).

Claimant returned to Dr. Chand's office on August 1, 2007, reported a rash after using hemorrhoid cream on her face. (Tr. 190). Dr. Chand found Claimant to have a skin reaction to

the substance and ordered Claimant to avoid further exposure to any substance irritating to the skin and to take Benadryl as needed for itching.  (Tr. 192).  On August 23, 2007, Dr. Chand treated Claimant's acute bronchitis with upper respiratory infection by prescribing Albuterol, Zythromax, and Histex.  (Tr. 188-89, 504-05).  Claimant reported smoking one package of cigarettes each day.  (Tr. 503).

On October 8, 2007, Claimant received treatment for chest pain in the emergency room at the Iron County Hospital.  (Tr. 231-41).  Dr. Daniel Abodeely noted in the radiology report that the examination of the chest demonstrated a normal heart and mediastinum and no infiltrate or pneumothorax.  (Tr. 242).  On October 9, 2007, Claimant was admitted with chest pain to Des Peres Hospital and underwent a cardiac catheterization.  (Tr. 247, 260-61).  Dr. Zafar Quader determined the cardiac catheterization to be completely negative and Dr. Quader in consultation evaluated Claimant to determine the noncardiac cause of her chest pain.  (Tr. 247).  In his impression, Dr. Quader found Claimant to have noncardiac chest pain, hypertriglyceridemia, hypertension, and very rare reflux.  (Tr. 248).  The esophagogastroduodenoscopy showed Claimant to have a hiatus hernia and a normal esophagus.  (Tr. 250-59).

On October 23, 2007, Claimant returned for treatment for her rotator cuff and requested a letter releasing her to light duty.  (Tr. 185).  Examination showed Claimant's mental status to be awake, alert, and oriented.  (Tr. 186, 499).  Dr. Chand found Claimant to have normal language, comprehension, and fluency with Claimant having good recall of recent and remote events.  (Tr. 186, 499).  Dr. Chand included in his assessment rotator cuff tendinitis, rotator cuff partial, and uncontrolled hypertension.  (Tr. 187, 500).  Dr. Chand prescribed Oxycodone with zero refills and Adalact.  (Tr. 187, 500).

On November 15, 2007, on referral by Dr. Chand, Dr. Scott VanNess, an orthopedic surgeon, evaluated Claimant's left shoulder pain. (Tr. 285-86). Dr. VanNess treated Claimant with an injection and determined further treatment recommendations would be made pending the scan results and history of her injury. (Tr. 285-86).

In the Physical Residual Functional Capacity Assessment completed on December 28, 2007, by Dawn Horn, a medical consultant, the consultant listed degenerative joint disease as Claimant's primary diagnosis and hypertension as her secondary diagnosis. (Tr. 287-92). The consultant determined that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, stand/walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push/pull limited in upper extremities. (Tr. 288). In support of her findings, the consultant reviewed the medical record. (Tr. 288-89). The consultant noted that Claimant has been diagnosed with hypertension and mitral valve prolapse. (Tr. 288). The consultant noted that Claimant has been diagnosed with rotator cuff injury and rotator cuff tendinitis and partial tear. (Tr. 289). Physical examination of June 2007 showed range of motion of elbows, hands and shoulders to be within normal limits. Because of partial thickness tear, Claimant should be limited in overhead reaching. Although Claimant alleges back pain, examination in November 2006 showed range of motion of cervical and lumbar spine in upper and lower extremities full in all planes and no restriction to passive range of motion. Although Claimant complained of bronchitis and had been diagnosed with bronchitis and treated with medication, Claimant continued to smoke a package of cigarettes each day. The consultant further noted that Claimant alleged heel spurs in both feet, and had surgery in February 2006 to remove bone spurs. On January 4, 2007, the diagnosis of heel pain is included in treatment notes but no treatment or functional limitations

are made.  The consultant determined that the medical evidence record and Claimant's allegations regarding the limiting effects of her impairments are not entirely credible.  The consultant opined that the medical evidence record "does not warrant an allowance, as Clm neither meets or equals a listing, and the limitations assessed in the RFC do not result in a med-voc allowance." (Tr. 289).  The consultant indicated that Claimant has postural limits of occasionally balancing, kneeling, crouching, and crawling and manipulative limits in reaching in all directions including overhead.  (Tr. 290).  The consultant determined that Claimant had no established visual or communicative limitations.  (Tr. 290-91).  With respect to environmental limitations, the consultant determined that Claimant should avoid concentrated exposure to extreme cold, hazards, and fumes, dusts, gases, and poor ventilation.  (Tr. 291).

In a follow-up visit on December 11, 2007, Dr. Chand noted that Claimant had good recall of recent and remote events, and her affect to be appropriate.  (Tr. 495-96).  Dr. Chand continued Claimant's medication regime as treatment.  (Tr. 497).

In the Psychiatric Review Technique completed on January 7, 2008, Dr. James Spence, PhD, found Claimant to have an affective disorder, depression, and anxiety-related disorders, anxiety syndrome and found mild functional limitations in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace.  (Tr. 293-302).  Dr. Spence noted that Claimant was diagnosed with depression and anxiety syndrome in December 2006 by Claimant's treating physician.  (Tr. 303).  Dr. Spence assessed Claimant's impairment as non-severe noting that the treating physician examined Claimant on October 23, 2007, and found Claimant to have normal language comprehension and fluency, good recall of recent and remote events, and affect to be appropriate and the assessment did not include any

diagnosis of any mental impairment. (Tr. 303).

Claimant returned to Dr. Chand's office on May 9, 2008, and reported in the process of getting off steroids and the pain in her feet and shoulders was coming back. (Tr. 491). Dr. Chand treated Claimant's bilateral shoulder tendinitis and her arthralgias. (Tr. 493). Dr. Chand ordered x-rays of Claimant's shoulders to evaluate for degenerative joint disease and prescribed a fentanyl patch. (Tr. 493).

The x-ray of May 13, 2008 of Claimant's left shoulder revealed mild hypertrophy of the acromioclavicular joint. (Tr. 405). The x-ray of Claimant's right shoulder revealed mild to moderate AC joint hypertrophy. (Tr. 406).

On May 14, 2008, Dr. Maria Vintimilia evaluated Claimant's bilateral shoulder arthralgias. (Tr. 437-40). Claimant reported being diagnosed with a partial tear in her left shoulder and steroid injections helping in part. (Tr. 437). Although Lidoderm patches helped alleviate her pain, Medicaid did not cover the patches, and Claimant reported not having tried morphine. (Tr. 437). Dr. Vintimilia noted inability to abduct Claimant's shoulders due to pain. (Tr. 439). Dr. Vintimilia diagnosed Claimant with bilateral shoulder tendinitis and administered an injection as treatment and prescribed morphine and tramadol and indicated that she would consider a MRI if no improvement. (Tr. 439). Claimant reported smoking one package of cigarettes each day. (Tr. 438). In a follow-up visit on May 28, 2008, Claimant reported injections really helped. (Tr. 432). Dr. Vintimilia noted that Claimant cannot abduct her shoulders due to pain, and x-ray showing bone spurs. (Tr. 432). Dr. Vintimilia opined that Claimant's bilateral shoulder tendinitis to be improved and prescribed Amitryptiline and Lidoderm patch as treatment. (Tr. 434).

On June 11, 2008, Claimant returned to Dr. Vintimilia's office for treatment of

degenerative joint disease and tendinitis in her shoulders. (Tr. 427). Claimant reported shoulders doing fine after injections, and the morphine prescription helping significantly with her pain. (Tr. 427). Dr. Vintimilia continued Claimant's morphine prescription. (Tr. 429).

In a follow-up visit on June 24, 2008, Claimant reported having diabetic neuropathy. (Tr. 488). Dr. Chand found Claimant to have an neuropathy, hypertension, and hypothyroidism. (Tr. 487). Dr. Chand refilled Claimant's prescriptions. (Tr. 489). On July 2, 2008, Dr. Chand diagnosed Claimant with diabetes mellitus and ordered Claimant to reduce her weight and exercise daily. (Tr. 481-83). Dr. Chand prescribed metformin, Ambien, and Phenergan tablets. (Tr. 484). Claimant returned on July 11, 2008, and reported that she stopped taking metformin and neurontin. (Tr. 477). Dr. Chand diagnosed Claimant with urinary tract infection and nausea and gave her a sample of Levaquin as treatment. (Tr. 479).

On July 11, 2008, Claimant returned to Dr. Vintimilia's office and reported nausea and fever even though she finished antibiotics a few days earlier. (Tr. 422). Claimant reported taking medication for blood pressure and experiencing some chest pain. (Tr. 422). Dr. Vintimilia noted unable to abduct Claimant's shoulders due to pain. (Tr. 424). Dr. Vintimilia continued Claimant's medication regime and added Ultram. (Tr. 424).

On August 11, 2008, Claimant returned for follow-up treatment for osteoarthritis in multiple joints and shoulder tendinitis. (Tr. 417). Claimant requested repeat injections noting how injections three months earlier helped with her pain. (Tr. 417). Dr. Vintimilia administered injections in both shoulders and refilled Claimant's medication regime. (Tr. 419).

In a follow-up visit on August 12, 2008, Claimant returned for a recheck and reported having her blood levels tested. (Tr. 467). Claimant reported doing well and being fatigued

without medications.  (Tr. 467).  Dr. Chand diagnosed Claimant with hypothyroidism and prescribed medications as treatment.  (Tr. 469).

On September 10, 2008, Claimant returned for treatment of shoulder tendinitis and reported Morphine, Ultram, and Lidoderm patches are helping.  (Tr. 413).  Dr. Vintimilia refilled her prescriptions.  (Tr. 415).

Claimant returned to Dr. Chand's office on September 12, 2008, and reported having a mild fever and sore throat.  (Tr. 464).  Dr. Chand diagnosed Claimant with tonsillitis, obesity, hypertension, and hypothyroidism and prescribed medications as treatment.  (Tr. 466).  In a follow-up visit on September 24, 2008, Claimant reported having a cough.  (Tr. 460).  Dr. Chand diagnosed Claimant with acute bronchitis, pharyngitis, and asthma and prescribed medications as treatment.  (Tr. 462).

On October 3, 2008, Claimant reported having back pain.  (Tr. 456).  Examination showed Claimant's to have a full range of motion of her cervical and lumbar spine upper and lower extremities.  (Tr. 458).  Dr. Chand prescribed a Medrol dose pack as treatment.  (Tr. 458).

In a follow-up visit on October 8, 2008, Claimant returned for treatment of shoulder tendinitis and reported Morphine, Ultram, and Lidoderm patches are helping.  (Tr. 409).  Claimant reported that she stopped smoking one month earlier.  (Tr. 409).  Dr. Vintimilia continued Claimant's medication regime of Morphine and Lidoderm patch.  (Tr. 411).

The x-rays dated October 9, 2008, of Claimant's right and left knees showed no joint effusion.  (Tr. 442-43).

On October 13, 2008, Claimant reported having angina.  (Tr. 451).  After examining Claimant, Dr. Chand decided to admit Claimant to the hospital.  (Tr. 453).  In a follow-up visit on

October 23, 2008, Claimant reported having a new right shoulder pain. (Tr. 447). In his assessment, Dr. Chand included cough and smoker and instructed Claimant to take Robitussin as needed. (Tr. 449).

On December 29, 2008, Dr. Steven Smith completed a internal medicine examination for Missouri Disability Determination to evaluate Claimant's back pain, arthritis, pain in feet, mitral valve prolapse, shoulder pain, and hypertension. (Tr. 521). Dr. Smith noted Claimant to be moderately obese, and her gait to be stable without a limp or use of supportive device. (Tr. 522). Dr. Smith observed Claimant to appear to be comfortable standing, sitting, and in changing positions. Examination showed Claimant to have a full range of motion in her shoulders with mild pain. (Tr. 522). Dr. Smith observed Claimant able to walk tandem without difficulty and heel and tip toe walk across the examining room with good balance. (Tr. 523). Dr. Smith noted in his impression the following: diabetic neuropathy with minimal symptoms, controlled hypertension, controlled hypothyroid, moderate obesity, normal back examination, and no sign of mitral valve prolapse. Dr. Smith opined that Claimant's use of morphine and hydrocodone to be long standing and suggesting dependence. (Tr. 523).

On January 13, 2009, Dr. Lauretta Walker, PhD completed a psychiatric evaluation of Claimant on behalf of Disability Determinations. (Tr. 535). Claimant reported last working in Dr. Chand's office in the summer of 2007. (Tr. 536). Claimant admitted overusing Oxycodone for a while. Claimant reported living alone and being able to care for her home "by doing things very slowly and in very brief time periods." (Tr. 536). Dr. Walker diagnosed Claimant with dysthymic disorder, pain disorder, diabetes, high blood pressure, foot and leg pain, and torn rotator cuff and assessed her current GAF to be 60. (Tr. 537). In the Medical Source Statement of Ability to Do

Work-Related Activities (Mental), Dr. Walker noted that Claimant's depression seems to be having some effect on her memory.  (Tr. 538).

## IV.     The ALJ's Decision

The ALJ found that Claimant met the special earnings requirements of the Act as of May 31, 2007, the alleged date of disability and continued to meet them through the date of the decision.  (Tr. 18).  The ALJ found that Claimant has probably not engaged in substantial gainful activity since the alleged onset date of disability although she worked part-time at her past relevant work as a nurse for more than three months between August and November 2007.  The ALJ found that the medical evidence establishes that Claimant has the impairments of obesity, mild-degenerative joint disease of the shoulders, mild diabetic peripheral neuropathy, possible mild unrelated depression, hypertension, hypothyroidism. and diabetes controlled by medication. The ALJ opined that Claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations sufficient severity to prevent the performance of all sustained work activity is not credible.  The ALJ determined that Claimant has only slight abnormalities that do not significantly affect the performance of any basic work-related activities and, therefore, she does not have a severe impairment.  (Tr. 18).  The ALJ concluded that Claimant is not under a disability at any time through the date of his decision.  (Tr. 19).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the claimant's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred by not finding Claimant to have a severe impairment

and to be credible.  Next, Claimant contends that the ALJ failed to appropriately determine the other jobs Claimant could perform.

A.  Severity of Claimant's Impairments

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred by not finding Claimant to have a severe impairment and to be credible.

In her applications for disability benefits, Claimant alleged disability due back problems, arthritis, mitral valve prolapse, shoulder, hypercholesterolemia, angina, bronchitis, hernia, insomnia, and heel spur on both heels.  The ALJ found Claimant has only slight abnormalities not significantly limiting the performance of any basic work activities, and concluded that the impairments, alone or in combination, are not of listing level.  The Social Security regulations define a nonsevere impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities.  See 20 C.F.R. §§ 404.1521(a), 416.921(a).  Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521(b), 416.921(b).  In finding Claimant's impairments not to be severe impairments, the ALJ found that her chronic conditions were either well controlled by medication (hypertension, hypothyroidism, diabetes) or mild in degree (degenerative joint disease of the shoulders, diabetic neuropathy).  Further, the ALJ noted there is no evidence of heart disease, other than hypertension.  Likewise, the ALJ found the evidence to be devoid of documentation

showing actual rotator cuff tears.  The ALJ noted that Claimant had never had surgery for either shoulder, nor had surgery ever been recommended by any doctor.  The ALJ found that Claimant did not have most of the documented clinical signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently reoccurring  muscle spasms, neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, inflammatory signs, or bowel or bladder dysfunction.  The ALJ noted that the medical record established no inability to ambulate effectively or to perform fine or gross motor movements effectively on a sustained basis due to any musculoskeletal impairment.  Accordingly, the ALJ determined that the impairments did not have more than a minimal impact upon the Claimant's ability to engage in basic work-related activities such that it did not satisfy 20 C.F.R. §§ 404.1521 and 404.921.

The record shows that the ALJ did consider the nature of her impairments in reaching his decision.  The ALJ discussed how Claimant's medically established allegations have been responsive to surgery or lesser measures such as physical therapy, mildly to moderately serious but controlled by medication or other unobtrusive treatment.  The ALJ noted how some of Claimant's allegations pre-date her alleged onset date of disability and never prevented Claimant from working.  The record shows that when Claimant's impairments are treated, either by medication or some milder form of conservative treatment measure, the impairments respond and abate.  The ALJ noted that the x-ray records showed nothing remarkable or significant.  The Court finds Claimant's contention that the ALJ erred in failing to find her impairments to be severe impairments and to determine their effect on her limitations to be without merit.

The ALJ further noted that no treating or examining doctor had found Claimant to be

disabled or totally incapacitated or ordered any work limitations. Since the plantar fasciitis surgery in February 2006, before her alleged onset date of disability, Claimant has not had any surgery. The medical records show that Claimant's alleged onset date of disability is May 31, 2007, but she continued to work until August, 2007. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). The ALJ also noted that the medical records do not show any significant, uncontrollable adverse side effects from any of Claimant's prescribed medications. The ALJ found that any side effects Claimant experienced from her medications were eliminated or diminished by change the type of medication or the dosage of the medication.

The ALJ considered the medical record and the diagnoses by all the treating physicians and explained why he was crediting the diagnosis of some of the doctors and not crediting the diagnosis of other doctors. Based on the objective medical evidence, the ALJ  determined Claimant's impairments not to be severe impairments, and the undersigned finds that substantial evidence supports the ALJ's determination. The undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict. Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical

evidence is equally balanced, ... the ALJ resolves the conflict."). "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

Nonetheless, the ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints of constant pain were not credible. The credibility of Claimant's subjective complaints is especially important. Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). In addition, the ALJ noted that no physician, even her treating physician, Dr. Chand, had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Likewise, the ALJ noted that Claimant received conservative medical treatment. See Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)(lack of ongoing treatment is inconsistent with complaints of disabling condition). The medical record is devoid of any evidence showing that Claimant's condition had deteriorated or precluded her from working in the past. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (claimant not considered disabled when claimant worked with an impairment over a period of years absent significant deterioration). Indeed, the ALJ stated that despite Claimant's testimony regarding constant pain, the medical evidence shows that Claimant's pain was controlled with medication. Likewise, the ALJ stated the record failed

to reveal Claimant's medication not to be effective, or that Claimant suffered severe side-effects. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). The ALJ further noted inconsistencies between Claimant's subjective complaints of pain and her daily activities. In addition, the ALJ considered Claimant's excellent work history, and noted that her work record is only one factor to be considered when assessing credibility.

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, the courts normally defer to his credibility determination). The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. Those included Claimant's minimal treatment for pain, her lack of work restrictions by any physicians, and her ability to work after the alleged onset date of disability. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of constant pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.          Other Work

Claimant contends that the ALJ failed to appropriately determine the other jobs Claimant could perform. After finding that Claimant was not disabled at step two of the sequential evaluation process, the ALJ found in the alternative that Claimant could perform other work existing in significant numbers in the national economy. (Tr. 17-18). Although erroneously referencing Illinois, not Missouri, the ALJ's finding there were significant number of jobs that Claimant could perform is supported by substantial evidence on the record as a whole. Where the guidelines are used and a decision of not disabled is the result, administrative notice is taken of the numbers of unskilled jobs that exist throughout the national economy. See 20 C.F.R. part 404, subpart P, appendix 2 § 200.00(b). Accordingly, the ALJ established that there were other jobs existing in significant numbers in the national economy that Claimant could perform.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the

ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of

the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.


                                           /s/ Terry I. Adelman
_____
                          UNITED STATES MAGISTRATE JUDGE

Dated this    29th    day of March, 2011.